**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NANCY CHRISTINE BOONE, | ) | CASE NO. 1:21-CV-01453-PAB |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    INTRODUCTION

Plaintiff Nancy Christine Boone ("Boone") seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB"), Period of Disability ("POD"), and Social Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated 09/02/2022). For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.    PROCEDURAL HISTORY

On January 7, 2020, Boone filed applications for DIB, POD, and SSI, alleging a disability onset date of November 21, 2018. (ECF Doc. No. 5, Exhibit 1D, PageID # 195; *id*. at Exhibit 2D, PageID # 199). Boone's applications related to her conditions of multiple sclerosis ("MS"), Crohn's disease, and vertigo. (*See* ECF Doc. No. 5, Exhibit 3A, PageID # 93). The Social Security Administration ("SSA") denied Boone's applications initially and upon reconsideration, and Boone requested a hearing before an administrative law judge ("ALJ"). (ECF Doc. No. 5, Exhibit 4B, PageID # 125; *id*. at Exhibit 5B, PageID # 130; *id*. at Exhibit 7B, PageID # 136; *id*. at Exhibit

8B, PageID # 141; *id.* at Exhibit 10B, PageID # 144). On August 25, 2020, an ALJ held a hearing via telephone during which Boone, represented by counsel, and an impartial vocational expert ("VE") testified. (ECF Doc. No. 5, PageID # 51-81). On September 28, 2020, the ALJ issued a written decision finding that Boone is not disabled. (*Id.* at PageID # 32-45). The ALJ's decision became final on June 1, 2021, when the Appeals Council declined further review. (*Id.* at PageID # 21).

On July 28, 2021, Boone filed her Complaint to challenge the Commissioner's final decision. (ECF Doc. No. 1). The parties have completed briefing in this case. (ECF Doc. Nos. 9, 10, and 11). Boone asserts the following four assignments of error:

(1) The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.

(2) The ALJ erred when he failed to find that Boone's additional medically determinable impairments were severe at Step Two of the Sequential Evaluation.

(3) The ALJ committed harmful error when he failed to find that Boone satisfied the criteria of Listing 11.09 at Step Three of the Sequential Evaluation. In the alternative, the ALJ erred when his RFC failed to consider the effect of the combination of Boone's severe impairments on her ability to engage in substantial gainful activity on a sustained and full-time basis.

(4) The ALJ erred in that his evaluation of Boone's symptoms was in violation of Social Security Ruling 16-3p.

(ECF Doc. No. 9, PageID # 711-12).

## III.    BACKGROUND

### A.    <u>Personal, Educational, and Vocational Experience</u>

Boone was born in 1983, and she was 35 years old on the alleged onset date (*see* ECF Doc. No. 5, Exhibit 1D, PageID # 195), making her a "younger" person under the Social Security Regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c). Boone has a high school education, is married, and has three children, including one step-child. (ECF Doc. No. 5, PageID # 68). Boone's past

relevant work includes work as a PCA (*i.e.*, a personal care assistant) and a telemetry technician. (*Id.* at PageID # 73-74).

**B.**     **Relevant Hearing Testimony**

*1.*     ***Boone's Testimony***

Boone testified that she was diagnosed with MS in 2009, but that she was able to work on and off over the years until her symptoms worsened in 2018. (ECF Doc. No. 5, PageID # 61-62). Boone testified she has experienced vertigo since 2009, that medications have not helped, and that she stopped working, in part, because she no longer felt comfortable driving the long distance to work. (*Id.* at PageID # 65, 62).  Boone testified that she has also experienced falls, memory issues, weakness in her lower extremities, foot drop, and nerve pain, and that she now uses a cane to ambulate. (*Id.* at PageID # 61). Boone testified that her nerve pain limits her mobility and daily activities, and that medications have not helped. (*Id.* at PageID # 63-64).

Boone testified that she can walk twenty feet without stopping, that she can stand for a maximum of fifteen minutes, and that she cannot sit for long periods of time due to pain and discomfort. (*Id.* at PageID # 65-66). Boone also testified that she can lift ten pounds, that she can drive short distances, and that she has difficulty turning her head in different directions. (*Id.*). Boone testified that she is forgetful, that she gets confused easily, that she experiences brain fog, and that she has difficulty concentrating. (*Id*. at PageID # 70).

Regarding her ability to care for herself, Boone testified that she can perform some personal hygiene herself, but that her husband helps her dress because she has difficulty bending over and reaching her arms over her head. (*Id.* at PageID # 67). Regarding her social activities, Boone testified that she attends church, that she occasionally goes to restaurants, and that she attends her son's band concerts and sporting events. (*Id.* at PageID # 68). Boone also testified that she enjoys doing small crafts and gardening with the help of her son and husband. (*Id.* a PageID #

68-69).

Boone testified that, during a typical day, she tries to do things around the house, naps in the afternoon for about two hours, prepares dinner, cleans up after dinner with the help of her family, and then spends the rest of the evening on the couch until she goes to bed. (*Id.* at PageID # 70-71). Boone testified that she has difficulty sleeping due to pain, and that she typically wakes up after her pain medication has worn off. (*Id.* at PageID # 69). She further testified that her cervical spine pain started to worsen "a couple weeks ago[,]" and that she had started physical therapy for that condition. (*Id.* at PageID # 72).

### 2. *Vocational Expert's Testimony*

The VE testified as to Boone's past work experience as a PCA/home health aide in  hospital and home-care settings, as well as her past work experience as a telemetry technician. (ECF Doc. No. 5, PageID # 73-75). The VE testified that the PCA positions are semi-skilled work with medium exertion as generally performed, but that they were performed as very heavy exertion in this case. (*Id.* at PageID # 74). The VE also testified that the telemetry technician position is skilled work with sedentary exertion as generally performed, but that it was performed as light exertion in this case. (*Id.* at PageID # 75).

The ALJ then asked the VE to assume a hypothetical individual with Boone's age, education, and work experience, who could perform work with the following limitations:

- can lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently;
- can stand or walk for four hours out of an eight-hour workday;
- can sit for six hours in an eight-hour workday;
- cannot use left lower extremity foot controls;
- requires a cane for community distances;
- can occasionally climb ramps and stairs;
- cannot climb ladders, ropes, or scaffolds;
- can occasionally balance, stoop, kneel, crouch, and crawl;
- must avoid concentrated exposure to extreme heat or extreme cold or humidity; and
- must avoid even moderate exposure to hazards including unprotected heights or

4

dangerous moving equipment.

(*Id.* at PageID # 75-76). The ALJ then asked the VE whether that hypothetical individual could perform Boone's past work. (*Id.* at PageID # 76). The VE responded that the hypothetical individual could not perform Boone's past work as a PCA, but could perform Boone's past work as a telemetry technician as generally performed. (*Id.*). Boone's counsel then asked the VE whether a hypothetical individual could still perform the telemetry technician position if that person needed a cane for standing, walking, and balancing. (*Id.*). The VE responded that the telemetry technician position could still be performed as generally performed, but not as actually performed. (*Id.*). Boone's counsel then asked the VE whether a hypothetical individual could still perform the telemetry position if that person would need to take frequent breaks to rest (in addition to regularly scheduled breaks), would be off task about fifteen percent of the day, and would miss more than two days of work per month. (*Id.* at PageID # 76-77). The VE responded that these additional limitations would not be tolerated. (*Id.*).

After the VE finished testifying, Boone testified that her past work as a telemetry technician required her to sit in front of computer screens for several hours per day, which "set off [her] vertigo[.]" (*Id.* at PageID # 77-78).

### C.     Relevant Medical Evidence

The relevant medical evidence is more fully discussed in the analysis of Boone's assignments of error below. That discussion is limited to the portions of the record cited by the parties in their briefs and/or deemed relevant to the instant case. By way of summary, though, the record indicates that Boone was diagnosed with MS in 2009, that she experienced periods of remission, and that she presented for treatment of her worsening symptoms in 2019. (ECF Doc. No. 5, Exhibit 4F, PageID # 400). At that time, Boone reported being "very tired[,]" having weakness on her right side, experiencing "electrical shocks and a burning sensation all over[,]"

using a cane, and having recent falls. (*Id.*). Boone also has a history of uterine fibroids and "[m]ild" Crohn's disease. (*Id.* at PageID # 401). The medical evidence indicates that Boone complained of nerve pain, forgetfulness, and that her use of Gabapentin for nerve pain made her sleepy. (*Id.* at PageID # 405). Medical records also indicate diagnoses of GERD, Crohn's disease, diarrhea, insomnia, right torn meniscus, supraventricular tachycardia, anxiety, and cervical spondylosis without myelopathy, among others. (ECF Doc. No. 5, Exhibit 5F, PageID # 412, 416, 426; *id.* at Exhibit 8F, PageID # 625).

### D.     State Agency Medical Consultants

#### 1.     *Mehr Siddiqui, M.D.*

At the initial level, Dr. Siddiqui, a neurologist, reviewed Boone's file on February 25, 2020. (ECF Doc. No. 5. Exhibit 3A, PageID # 93; *id.* at Exhibit 4A, PageID # 99). Dr. Siddiqui indicated that Boone's MS and gastrointestinal disorder are severe medically determinable impairments. (*Id.* at Exhibit 3A, PageID # 94). In her residual functional capacity ("RFC") assessment, Dr. Siddiqui indicted that Boone could:

- occasionally lift and/or carry twenty pounds;
- frequently lift and/or carry ten pounds;
- stand and/or walk (with normal breaks) for four hours in an eight-hour workday;
- sit (with normal breaks) for about six hours in an eight-hour workday;
- frequently climb ramps and stairs;
- never climb ladders, ropes, or scaffolds; and
- balance, stoop, kneel, crouch, and crawl on an unlimited basis.

(*Id.* at PageID # 95-96). Dr. Siddiqui also indicated that Boone has no manipulative, visual, or communicative limitations, but that Boone does have some environmental limitations. (*Id.* at PageID # 96).

#### 2.     *Gail Mutchler, M.D.*

At the reconsideration level, Dr. Mutchler, a pulmonologist, reviewed Boone's file on June 3, 2020. (ECF Doc. No. 5, Exhibit 7A, PageID # 107; *id.* at Exhibit 8A, PageID # 114). In his RFC

assessment, Dr. Mutchler indicted that Boone could:

- occasionally lift and/or carry twenty pounds;
- frequently lift and/or carry ten pounds;
- stand and/or walk (with normal breaks) for four hours in an eight-hour workday;
- sit (with normal breaks) for about six hours in an eight-hour workday;
- occasionally climb ramps and stairs;
- never climb ladders, ropes, or scaffolds;
- occasionally balance, stoop, kneel, and crouch; and
- frequently crawl.

(*Id.* at Exhibit 7A, PageID # 110-11). Dr. Mutchler also indicated that Boone has no manipulative,

visual, or communicative limitations, but that Boone does have some environmental limitations.

(*Id.* at PageID # 111). Dr. Mutchler further indicated that Boone ambulates with a cane, and that

"[a] medically required hand-held assistive device is necessary for ambulation[.]" (*Id.* at PageID

# 110).

## IV.    THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through
      December 31, 2023.

2.    The claimant has not engaged in substantial gainful activity since November 21,
      2018, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.    The claimant has the following severe impairment: multiple sclerosis (with foot drop)
      (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets
      or medically equals the severity of one of the listed impairments in 20 CFR Part 404,
      Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d),
      416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the
      claimant has the residual functional capacity to perform sedentary work as defined in
      20 CFR 404.1567(a) and 416.967(a) except cannot use left lower extremity foot
      controls; requires a cane for community distances; can occasionally climb ramps and
      stairs; can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop,
      kneel, crouch or crawl; must avoid concentrated exposure to extreme heat, extreme
      cold, or humidity; must avoid even moderate exposure to hazards including
      unprotected heights or dangerous moving equipment; requires a cane for standing,
      walking, or balancing.

6.      The claimant is capable of performing past relevant work as a Telemetry Technician. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from November 21, 2018, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

8.      The claimant has not engaged in substantial gainful activity since March 28, 2020, the alleged onset date (20 CFR 404.1571 *et seq*.).

(ECF Doc. No. 5, PageID # 37-45).

## V.      LAW & ANALYSIS

### A.      <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards.

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original).

### B.    <u>Standard for Disability</u>

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a). A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. *See* 20 C.F.R. 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and

416.1201.[1]

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 404.1520. First, the claimant must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Before considering Step Four, the ALJ must determine the claimant's RFC, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 416.930(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbot*, 905 F.2d at 923.

**C.    Analysis**

Boone raises four issues for judicial review. First, Boone argues that the appointment of

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in some instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*e.g.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

former Commissioner Andrew Saul as the Commissioner of the SSA violated the separation of powers and, as a result, the ALJ's decision in this case is constitutionally defective because the ALJ derived his authority from Commissioner Saul. (ECF Doc. No. 9, PageID # 717). Second, Boone argues that the ALJ erred by failing to find that her medically determinable impairments of GERD, Crohn's disease, uterine fibroid, degenerative changes of the cervical spine, right torn meniscus, supraventricular tachycardia, insomnia, and anxiety are severe impairments at Step Two. (*Id.* at PageID # 720). Third, Boone argues that the ALJ erred by failing to find that her MS satisfies Listing 11.09 at Step Three or, alternatively, that the ALJ erred by failing to consider the combined effects of her severe impairments on her ability to engage in substantial gainful activity on a sustained and full-time basis. (*Id.* at PageID # 723). Fourth, Boone argues that the ALJ violated Social Security Ruling ("SSR") 16-3p when evaluating her symptoms. (*Id.* at PageID # 730). For the following reasons, I conclude that Boone's arguments lack merit.

### 1.   *Boone's First Assignment of Error*

As noted, Boone first argues that the ALJ's decision is constitutionally defective because the ALJ derived his authority from former Commissioner Andrew Saul, whose appointment as Commissioner of the SSA violated the separation of powers. (ECF Doc. No. 9, PageID # 717). For the following reasons, I disagree.

### i.      *Separation of Powers*

Former Commissioner Andrew Saul became Commissioner of the SSA on June 17, 2019, pursuant to 42 U.S.C. § 902(a). *See* Social Security Administration, Executive Bios, Andrew Saul, https://www.ssa.gov/ndf/documents/SSA%20Executive%20Bios-11182020.pdf (last visited Jan. 6, 2023). Section 902(a)(3) provides that "[a]n individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id.* The parties agree that portion of § 902(a)(3) violates the separation of

11

powers because it limits the President's authority to remove the Commissioner as the head of an executive agency. (ECF Doc. 9, PageID # 717; ECF Doc. 10, PageID # 746); *see also Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020) (statutory restriction on the President's ability to remove the head of an agency "for inefficiency, neglect, or malfeasance" violates the separation of powers and is unconstitutional); *Collins v. Yellen*, ––– U.S. ––––, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (*e.g.*, "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).

In *Seila Law*, the Supreme Court held that a statutory provision allowing the President to remove the Director of the Consumer Financial Protection Board ("CFPB") only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers doctrine by insulating the director from removal by the President. 140 S. Ct. at 2197. The Court also found that the unconstitutional removal provision was severable from the other provisions of the relevant statute, thereby maintaining the CFPB intact as an agency. *Id.* at 2208, 2211. The Supreme Court did not discuss what a plaintiff must show to obtain relief when challenging actions taken by the head of an agency who derived powers from a statute that included an unconstitutional removal provision. The Court addressed this issue in *Collins v. Yellen*.

In *Collins*, the Supreme Court considered a similar statute governing the removal of Directors of the Federal Housing Finance Agency ("FHFA"). The majority held that, "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by FHFA ... as void." 141 S. Ct. at 1787 (emphasis in original).

The Court in *Collins* further found "there is no basis for concluding that any head of the

FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. *Id.* at 1788; *id.* at 1778 n.23 (citing *Seila Law*, 140 S. Ct. at 2207-11) ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment"). Rather, to obtain reversal of an agency decision, a plaintiff would need to demonstrate "compensable harm" flowing from the unconstitutional removal clause. *Id.* at 1788-89. The Supreme Court offered examples of situations where unconstitutional removal restrictions could inflict compensable harm:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the status did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id.* at 1789.

### ii.    *Boone's Argument*

Here, Boone claims that she did not receive a valid administrative process because the ALJ and the Appeals Council's authority was derived from a Commissioner who was subject to an unconstitutional removal provision. (ECF Doc. No. 9. PageID # 718). Boone argues that this resulted in harm "in that while Commissioner, Mr. Saul implemented changes to HALLEX and new regulations which impacted [Boone] and her application for benefits." (*Id.* at PageID # 719). Boone concludes that she "was, therefore, harmed by the improper appointment of the Commissioner and the modifications which were implemented during Saul's tenure as commissioner." (*Id.*).

### iii.    *Analysis*

As in *Collins*, the existence of an unconstitutional removal provision did not strip Commissioner Saul of his authority to carry out the functions of his office, including the authority

to delegate disability determinations to ALJs and to implement changes to Agency regulations. Without Boone showing that § 902(a)(3)'s removal restriction inflicted specific, compensable harm on her, remand for a *de novo* hearing is not available to her.

Moreover, the ALJ who presided over Boone's case – Frederick Andreas – was not appointed by a Commissioner subject to § 902(a)(3)'s removal restriction, but rather was ratified by an Acting Commissioner who was not tenure-protected. (*See* ECF Doc. No. 10, PageID # 749). Because then-Acting Commissioner Berryhill served pursuant to provisions of the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349c, her appointment was not subject to the same constitutional deficiencies as Commissioner Saul. *See* 5 U.S.C. § 3346(a)(1). Then-Acting Commissioner Berryhill had no statutory tenure protections. *See* 42 U.S.C. § 902(b)(4); *see also Collins*, 141 S. Ct. at 1782-83 (citing 12 U.S.C. § 4512(f)) (noting that FHFA's Acting Director was removable at-will because the relevant subsection "does not include any removal restriction. Nor does it cross-reference the earlier restriction on the removal of a confirmed Director."); *United States v. Eaton*, 169 U.S. 331, 343 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered.").

Because then-Acting Commissioner Berryhill was not the "superior and permanent official" as a confirmed director, she was removable at-will; thus, there is no nexus between then-Acting Commissioner Berryhill's ratification of Judge Andreas's appointment and the unconstitutional provisions of § 902(a)(3). As a result, I conclude that Boone has not shown that then-Acting Director Berryhill or Judge Andreas lacked authority to carry out the functions of their

14

respective offices due to the constitutional defect in § 902(a)(3). *See Collins*, 141 S. Ct. at 1788 n.23 (noting that "unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . ").

Other federal courts in this judicial district, this state, and across the country, have also concluded that the allegedly unconstitutional appointment of Andrew Saul does not require remand. *See, e.g., Katrina R. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4276, 2022 WL 190055, at *5 (S.D. Ohio Jan. 21, 2022) (collecting cases); *Miley v. Comm'r of Soc. Sec.*, No. 1:20-CV-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021). I similarly decline to recommend remand on this basis. Thus, Boone has not articulated a specific, compensable harm that she sustained as a result of the unconstitutional removal provision in § 902(a)(3). As a result, Boone's argument lacks merit.

### 2.  Boone's Second Assignment of Error

Next, Boone argues that the ALJ erred by failing to find that her medically determinable impairments of GERD, Crohn's disease, uterine fibroid, degenerative changes of the cervical spine, right torn meniscus, supraventricular tachycardia, insomnia, and anxiety are severe impairments at Step Two, and that the ALJ failed to consider all of her impairments when assessing the RFC, necessitating a remand. (ECF Doc. No. 9,  PageID # 720-22). For the following reasons, I disagree.

### i.  Step Two & RFC

At Step Two of the sequential evaluation process, an ALJ must determine with a claimant's medically determinable impairment is a "severe" impairment.  *See* 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "Step two has been described as a '*de minimus* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight

abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988)). When an ALJ finds severe and non-severe impairments at Step Two and continues with the subsequent Steps in the sequential evaluation process, any error at Step Two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Prior to determining whether a claimant can perform her past relevant work at Step Four, an ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity."); 20 C.F.R. § 404.1520(e) ("[W]e will assess and make a finding about your [RFC] based on all the relevant medical and other evidence in your case record[.]"). RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). Agency regulations direct the ALJ's assessment of a claimant's RFC is to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. SSR 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

### ii.    *The ALJ's Analysis*

As noted, the ALJ determined that Boone's MS (with foot drop) is a severe medically determinable impairment. (ECF Doc. No. 5, PageID # 38). The ALJ also determined that Boone has the following non-severe medically determinable impairments: gastroesophageal reflux disease (GERD), Crohn's disease, uterine fibroid, degenerative changes of the cervical spine, right torn meniscus, supraventricular tachycardia, insomnia, and anxiety. (*Id.*). Regarding Boone's GERD, Crohn's disease, uterine fibroid, and insomnia, the ALJ explained:

> The signs and symptoms associated with the claimant's GERD, Crohn's disease, uterine fibroid, and insomnia were no more than mild. Treatment notes from a

September 3, 2019 evaluation reflect that the claimant treated with Xanax to treat her assessed insomnia. However, she noted that she rarely used the medication (3F/36-39). On October 3, 2019, she complained of intermittent diarrhea with a recent finding of blood in her stool. Upon examination, she exhibited normal bowel sounds and no abdominal distension, masses, tenderness, rigidity, rebound, or guarding (3F/28-32). A colonoscopy from October 11, 2019 revealed isolated small bowel ulcerations in the terminal ileum with patchy erythema suggestive of chronic ileitis, but not conclusive of Crohn's disease. Budesonide was prescribed for possible low risk/mild presentation (3F/18-26). On November 12, 2019, she reported unpredictable acid reflux and she was assessed with gastroesophageal reflux disease without esophagitis. However, no persisting limiting symptoms were reported (3F/14-17). Treatment notes from November 30, 2019 reflect that the claimant had a history of a uterine fibroid (3F/10-12, 5F/4-7). On January 14, 2020, she reported improvement in her symptoms of diarrhea after she treated with a course of budesonide (5F/15-18). The claimant underwent endometrial ablation on May 20, 2020, and no persistent issues related to her fibroid were thereafter noted (7F/18-34, 10F/18-34). She described two weeks of diarrhea on April 30, 2020 for which additional testing was recommended (6F/23-27). As of May 12, 2020, she reported improvement in her symptoms of diarrhea, and conservative treatment with over the courter Imodium was recommended (6F/22).

(*Id.* at PageID # 38). Regarding Boone's degenerative changes of the cervical spine, right torn meniscus, and supraventricular tachycardia, the ALJ explained:

The evidence supports no more than limited and conservative treatment for her degenerative changes of the cervical spine, right torn meniscus, and supraventricular tachycardia. Treatment notes from January 17, 2019 reflect that the claimant had a prior injury to her right meniscus earlier that year. She described right knee pain when walking after twisting the knee three weeks prior. She had right knee tenderness and pain with valgus stress, but had normal range of motion and an x-ray of the right knee was negative for acute pathology. A short-term prescription for Tramadol was provided (3F/43-45). During a September 3, 2019 evaluation, it was noted that she treated with metoprolol to manage supraventricular tachycardia. However, she exhibited a normal cardiovascular rate and rhythm, normal heart sounds, and no gallop or friction rub (3F/36-39). A September 5, 2019 cervical spine CT scan showed reversal of the cervical curvature suggesting muscle spasms, mild degenerative bone spurring involving the C5, C6, and C7 vertebra, and narrowed C6/7 disc space compatible with degenerative disc disease (3F/73- 74). Treatment notes from November 30, 2019 reflect that she had normal musculoskeletal range of motion and normal cardiovascular rate and rhythm (3F/10-12). During an evaluation on December 18, 2019, her heart markers were within normal limits and her D-dimer was negative (3F/3-9). She reported neck pain during an emergency department evaluation on August 8, 2020. Examination findings included cervical tenderness and painful range of motion, but range of motion was full. Tramadol was prescribed (7F/35-46). On August 13, 2020, she reported continued cervical pain, but denied any pain or paresthesia or numbness below the elbows bilaterally. A cervical MRI showed no more than mild degenerative changes of the lower cervical

spine with no evidence of cervical cord signal abnormalities (7F/48-49, 8F/1-5, 11F). Finally, treatment notes from August 14, 2020 reflect that the claimant's supraventricular tachycardia was improved (9F/2-4).

(*Id.* at PageID # 39). The ALJ concluded that "these impairments failed to meet the durational requirements of a severe impairment and/or caused only a slight abnormality having such minimal effect that they would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience and are therefore, non-severe." (*Id.*). The ALJ then noted that he considered Boone's non-severe impairments when assessing Boone's RFC. (*Id.*).

Regarding Boone's anxiety, the ALJ determined that it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (*Id.*). The ALJ explained:

On March 27, 2020, she reported feeling anxious about the pandemic which was contributing to symptoms of chest tightness and pressure. Upon examination, she appeared anxious, but was in no acute distress. Additionally, no concerns with memory were noted. She was assessed with an acute stress reaction (6F/41-45). Treatment notes from May 20, 2020 reflect a diagnosis for anxiety. However, her behavior, thought content, and judgment were normal (6F/17-21).

(*Id.*). The ALJ then addressed the "paragraph B" criteria, and determined that Boone has no more than mild limitations in the four broad functional areas. (*Id.* at PageID # 39-40).

In his RFC assessment, the ALJ noted that he considered the "entire record" and "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." (*Id.* at PageID # 41). The ALJ then addressed the limiting signs and symptoms associated with Boone's severe impairment of MS, but the ALJ did not specifically refer to Boone's non-severe medically determinable impairments of GERD, Crohn's disease, uterine fibroid, degenerative changes of the cervical spine, right torn meniscus, supraventricular tachycardia, insomnia, or anxiety. (*Id.* at PageID # 41-42).

### iii.   *Boone's Arguments*

Boone argues that the ALJ erred by failing to find that her medically determinable impairments of GERD, Crohn's disease, uterine fibroid, degenerative changes of the cervical spine, right torn meniscus, supraventricular tachycardia, insomnia, and anxiety are severe impairments at Step Two. (ECF Doc. No. 9,  PageID # 720). Boone argues that the ALJ failed to include any limitations stemming from these conditions in the RFC, and that the ALJ's failure to consider these impairments when assessing the RFC necessitates a remand. (*Id.* at PageID # 721-22).

In support of her argument that the above-mentioned impairments are severe, Boone points to her own testimony, wherein she indicated that she has problems with her cervical spine, frequent falls, memory issues, and vertigo. (*Id.* at PageID # 721). Boone also points to the following medical records:

- A medical record from Charles Choi, M.D. dated August 13, 2020, reflecting that Boone complained of neck pain and sleep disturbances, and also reflecting a diagnosis of cervical spondylosis without myelopathy. (ECF Doc. No. 5, Exhibit 8F, PageID # 621, 625). That record also indicates that Boone had not tried physical therapy. (*Id.* at PageID # 624).

- A medical record from the Mercy Hospital Emergency Department dated August 8, 2020, reflecting that Boone presented with neck pain. (ECF Doc. No. 5, Exhibit 7F, PageID # 606). That record indicates that Boone was not in acute distress, that she had a normal range of motion in her neck, that she experienced pain with movement, and that she was prescribed Tramadol and Lidocaine patches. (*Id.* at PageID # 611, 613).

- Medical records from neurologist Darshan Mahajan, M.D. dated January 8, 2020 and August 14, 2020, respectively reflecting that Boone reported that she "forgets things" and "had been having terrible neck pain[.]" (ECF Doc. No. 5, Exhibit 4F, PageID # 405; *id.* at Exhibit 9F, PageID # 627).

- A medical record from gastroenterologist Hicham Khallafi, M.D. dated October 31, 2019, reflecting that Boone's colonoscopy "showed scattered and mild erythema terminal ileum in addition to linear 2 to 3 mm ulcerations[,]" and that Boone's biopsies showed "chronic active ileitis but not conclusive for IBD Crohn's." (ECF Doc. No. 5, Exhibit 3F, PageID # 327). That record also indicates that Boone "has been having intermittent diarrhea for the last few

months[.]" (*Id.*)

- A progress note from Jennifer Anne Mize, A.P.R.N., C.N.P. dated April 30, 2020, reflecting that Boone complained of diarrhea. (ECF Doc. No. 5, Exhibit No. 6F, PageID # 487). That record also indicates that Boone had abdominal cramping, but no abdominal distention. (*Id.* at PageID # 490).

- A medical record from Garren Decaro, M.D. dated September 3, 2019, reflecting diagnoses of MS, primary insomnia, idiopathic neuropathy, mild intermittent asthma, and dermatitis mometasone. (ECF Doc. No. 5, Exhibit 3F, PageID # 347). That record also indicates that Boone was negative for abdominal pain and back pain, and that Boone had normal bowel sounds with no distention. (*Id.*)

- A medical record from Garren Decaro, M.D. dated November 12, 2019, reflecting diagnoses of mitral valve stenosis, gastroesophageal reflux without esophagitis, and a colon ulcer. (ECF Doc. No. 5, Exhibit 3F, PageID # 325). That record also indicates that Boone was negative for abdominal pain and neck pain, and that Boone had normal bowel sounds. (*Id.*)

- A radiology report from an MRI performed on August 13, 2020, reflecting "mild degenerative changes of the lower cervical spine[,]" and small disc bulges at C5-C6 and C6-C7. (ECF Doc. No. 5, Exhibit 7F, PageID # 619).

- A medical record from gastroenterologist Hicham Khallafi, M.D. dated January 14, 2020, reflecting that Boone had previously complained of intermittent abdominal pain and diarrhea, that she improved with medication, but that she was now having intermittent diarrhea. (ECF Doc. No. 5, Exhibit 5F, PageID # 423). Dr. Khallafi assessed Boone as having "chronic ileitis" and "low risk/mild presentation of Crohn's disease." (*Id.* at PageID # 426). That record also indicates that Boone reported intermittent, non-daily cramps, that she had clinical improvement with Budesonide, but that Boone stopped using Budesonide due a change in her MS medication. (*Id.*).

(ECF Doc. No. 9, PageID # 721-22). After citing these records, Boone concludes that the above-mentioned impairments satisfy the *de minimus* standard under Step Two because the records show that her "Crohn's disease with related vertigo and dizziness, diarrhea, cervical spine injury, insomnia, and anxiety caused more that minimal limitations on her ability to engage in substantial gainful activity on a sustained and full-time basis." (*Id.* at PageID # 722).

### iv.    Analysis

Boone's argument that the ALJ erred by failing to find that her medically determinable

impairments of GERD, Crohn's disease, uterine fibroid, degenerative changes of the cervical spine, right torn meniscus, supraventricular tachycardia, insomnia, and anxiety are severe impairments at Step Two lacks merit. While the medical records Boone cites reflect diagnoses and that she experienced symptoms related to her diagnoses, "the mere diagnosis of a physical or mental condition says nothing about its severity." *Patterson v. Colvin*, No. 1:15-CV-00796-DAP, 2016 WL 552423, at *8 (N.D. Ohio Feb. 12, 2016) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)); *Lunsford v. Comm'r of Soc. Sec.*, No. 3:20CV2655, 2022 WL 2235529, at *2 (N.D. Ohio June 22, 2022) ("[A] claimant cannot meet his or her burden merely by establishing a diagnosis but, instead, must present evidence that the disorder is functionally disabling."). Additionally, to the extent Boone relies upon her subjective complaints to support her argument, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Yee v. Comm'r of Soc. Sec.*,  No. 1:21-CV-02067, 2023 WL 121417, at *8 (N.D. Ohio Jan. 6, 2023) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

Despite Boone's argument to the contrary, the records she cites do not support a finding that the above-mentioned impairments significantly limit her physical or mental ability to do basic work activities, or that they are anything more than slight abnormalities that minimally affect her work ability. 20 C.F.R. § 404.1520(c); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988)). The ALJ explained his reasoning for determining that these impairments are non-severe, and cited the relevant portions of the record upon which he relied. (ECF Doc. No. 5, PageID # 38-40). Boone has not established that the ALJ's decision in this regard is not supported by substantial evidence. Moreover, because the ALJ determined that Boone's MS is a severe impairment and (as discussed below) properly considered       Boone's       non-severe       impairments       at       later       Steps,       any       error

at Step Two was harmless. *Maziarz* 837 F.2d at 244; *see Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) ("An erroneous finding of nonseverity at step two is . . . harmless where the ALJ properly considers nonsevere impairments at later steps.").

To the extent Boone argues that the ALJ failed to consider all of her impairments when assessing the RFC, Boone's argument lacks merit. Courts have held that an ALJ need not specifically discuss all non-severe impairments in the RFC assessment when the ALJ makes clear that his decision is controlled by SSR 96-8p. *See, e.g.*, *Emard*, 953 F.3d at 851-52; *Turner v. Comm'r of Soc. Sec.*, 2021 WL 6275633 at * 4 (6th Cir. 2021); *Davis v. Comm'r of Soc. Sec.*, 2015 WL 5542986 at *4 (W.D. Mich. Sept. 18, 2015). Here, the ALJ expressly noted in his summary of the applicable law that he was required to comply with SSR 96-8p's mandate to "consider all of the claimant's impairments, including impairments that are not severe[.]" (ECF Doc. No. 5, PageID # 37). At Step Two, the ALJ considered Boone's non-severe impairments, determined that they "failed to meet the durational requirements of a severe impairment and/or caused only a slight abnormality having such minimal effect that they would not be expected to interfere with [Boone's] ability to work," and then addressed Boone's paragraph B functional limitations. (*Id.* at PageID # 38-40). In addition, at Step Two, the ALJ again stated that he had "considered the claimant's nonsevere impairments when assessing the claimant's residual functional capacity." (*Id.* at PageID # 39). Under these facts, Boone has not established that the ALJ committed reversible error by not specifically referencing her non-severe impairments in assessing Boone's RFC. *See Emard*, 953 F.3d at 852 ("The ALJ's express reference to SSR 96-8p, along with her discussion of the functional limitations imposed by [the claimant's] nonsevere impairments at step two of her analysis, fully support our conclusion that the ALJ complied with 20 C.F.R. § 416.945(e) and SSR 96-8p."); *but see Harrington v. Saul*, No. 3:20-CV-00852-JRK, 2021 WL 3174273, at *10 (N.D. Ohio July 9, 2021), *report and recommendation adopted sub*

*nom. Harrington v. Comm'r of Soc. Sec.*, No. 3:20 CV 852, 2021 WL 3165836 (N.D. Ohio July 26, 2021) (discussing an ALJ's analysis that failed to meet the standard set forth in *Emard*).

### 3. Boone's Third Assignment of Error

Next, Boone argues that the ALJ erred by failing to find that her MS satisfies Listing 11.09 at Step Three or, alternatively, that the ALJ erred by failing to consider the combined effects of her impairments on her ability to engage in substantial gainful activity on a sustained and full-time basis. (*Id.* at PageID # 723).

### i. Step Three

At Step Three of the sequential evaluation process, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App. 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). "A claimant must do more than point to evidence on which the ALJ could have based [her] finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App. 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App. 639, 641-42 (6th Cir. 2013)). "Rather, the claimant must point to specific evidence that

demonstrates [s]he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

"It is well-established that a reviewing court conducts a holistic review of the ALJ's decision and may look to findings elsewhere in the opinion to support Step Three conclusions." *Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) (citing *Immke v. Saul*, 2020 WL 1940849, at *6 (N.D. Ohio April 22, 2020)). "Moreover, it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision." *Anderson* at *2 (citing *Ulman v. Commissioner of Social Security*, 693 F.3d 709, 713-14 (6th Cir. 2012)).

### ii.        *Listing 11.09*

Listing 11.09 establishes the criteria for MS, and is divided into subsections A and B. 20 C.F.R. § 404, Subpart P, Appendix 1, §11.09. In order to meet the required level of severity under Listing 11.09(A), the claimant must show "[d]isorganization of motor function in two extremities . . . , resulting in an extreme limitation . . . in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities[.]" 20 C.F.R. § 404, Subpart P, Appendix 1, §11.09(A). Section 11.00D1 further defines "disorganization of motor function[,]" providing:

1.    Disorganization of motor function means interference, due to your neurological disorder, with movement of two extremities; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands, arms, and shoulders). By two extremities we mean both lower extremities, or both upper extremities, or one upper extremity and one lower extremity. All listings in this body system [with exceptions not pertinent here] include criteria for disorganization of motor function that results in an extreme limitation in your ability to:

    a.   Stand up from a seated position; or

    b.   Balance while standing or walking; or

    c.   Use the upper extremities (including fingers, wrists, hands, arms, and shoulders).

20 C.F.R. § 404, Subpart P, Appendix 1, §11.00D1. Section 11.00D2 further defines "[e]xtreme

limitation[,]" providing:

2.  Extreme limitation means the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders).

    a.  Inability to stand up from a seated position means that once seated you are unable to stand and maintain an upright position without the assistance of another person or the use of an assistive device, <u>such as a walker, two crutches, or two canes</u>.

    b.  Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, <u>such as a walker, two crutches, or two canes</u>.

    c.  Inability to use your upper extremities means that you have a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements. Inability to perform fine and gross motor movements could include not being able to pinch, manipulate, and use your fingers; or not being able to use your hands, arms, and shoulders to perform gross motor movements, such as handling, gripping, grasping, holding, turning, and reaching; or not being able to engage in exertional movements such a lifting, carrying, pushing, and pulling.

20 C.F.R. § 404, Subpart P, Appendix 1, §11.00D2 (emphasis added).

In order to meet the required level of severity under Listing 11.09(B), the claimant must show a marked limitation in physical functioning, and a marked limitation in one of the following: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. 20 C.F.R. § 404, Subpart P, Appendix 1, §11.09(B).

### iii. *Combined Effect of Impairments*

The SSA requires an ALJ to "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be

of sufficient severity." 20 C.F.R. § 404.1523(c). An ALJ's "analysis of a claimant's combined impairments is sufficient where the judge referred to a 'combination of impairments' in deciding the claimant did not meet the listings and all of the claimant's impairments were discussed individually in the decision." *Austin v. Comm'r of Soc. Sec.*, 714 F. Appx. 569, 575 (6th Cir. 2018) (citing *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987)). As one decision recently explained:

> [A]n ALJ's analysis of a claimant's combined impairments is sufficient where: (1) the ALJ referred to a "combination of impairments" in deciding that the claimant did not meet the listings; (2) the ALJ referred to the claimant's "impairments" as not being severe enough to preclude performance of his past relevant work; (3) the ALJ's decision was made after careful consideration of the "entire record;" and (4) all the claimant's impairments were discussed individually in the opinion. In that regard, the Sixth Circuit has also stated that to "require a more elaborate articulation of the ALJ's thought process would not be reasonable."
>
> Stated more simply, the Sixth Circuit has held that an ALJ properly considered the combined effects of the claimant's impairments when the ALJ's decision referred to the claimant's "impairments" and "combination of impairments." In addition, when the reviewing court analyzes the ALJ's decision on this question, "the Sixth Circuit has repeatedly emphasized the need to review the ALJ's decision as a whole."

*Wilson v. Kijakazi*, No. 5:20-CV-02414, 2022 WL 4616979, at *5-6 (N.D. Ohio Sept. 30, 2022) (citations omitted).

### iv.      The ALJ's Analysis

As noted, the ALJ determined that Boone "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" (ECF Doc. No. 5, PageID # 40). The ALJ then addressed Boone's MS, finding that it does not meet the severity requirement under Listing 11.09. (*Id.*) The ALJ explained:

> The undersigned considered the claimant's multiple sclerosis under listing 11.09 and finds that it does not meet or medically equal a listing. ***As discussed in more detail below***, the evidence does not support evidence of disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities. Further, the evidence does not support findings of a marked limitation

in physical functioning and in one of the following: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or, with adapting or managing herself.

(*Id.*) (emphasis added). Later in his opinion, the ALJ discussed the medical records related to Boone's diagnosis and treatment for MS, as well as Boone's symptoms including fatigue, mild weakness of the right lower extremity, foot drop, recent falls, use of a cane, nerve pain, mild difficulty with a Romberg's position, vertigo/dizziness, and pain. (*Id.* at PageID # 42-43).

### v.  *Boone's Arguments*

Boone argues that her MS satisfies Listing 11.09 because she "clearly had disorganization in two extremities as documented by the medical records . . . and the fact that she needed a cane for ambulation and balance." (ECF Doc. No. 9, PageID # 723). Boone also argues that the ALJ "offered only a perfunctory analysis" that was simply a recitation of the Listing. (*Id.* at PageID # 727). In support of her argument, Boone cites:

- A medical record from neurologist Darshan Mahajan, M.D. dated October 18, 2019, reflecting Dr. Mahajan's initial evaluation of Boone for MS, indicating that Boone was first diagnosed with MS in 2009, and reflecting that Boone had mild weakness in the right lower extremity, no abdominal reflexes, walks with a cane, and "can maintain Romberg's position with mild difficulty." (ECF Doc. No. 5, Exhibit 4F, PageID # 400, 402). That record also indicates that Boone "has decreased sensation in the right lower extremity," and that she was assessed for MS and "[r]epeated falls[.]" (*Id.* at PageID # 403).

- An MRI report dated November 7, 2019, indicating MS with increasing nerve pain and right-sided weakness. (ECF Doc. No. 5, PageID # 303).

- A follow-up record from Dr. Mahajan dated January 8, 2020, indicating that Boone uses a cane, that "[h]er Crohn's is acting up now[,]" that Boone had fallen due to her foot drop on her left foot, that her last fall was in November 2019, that she "forgets things at times[,]" and that she was "doing well." (ECF Doc. No. 5, Exhibit 4F, PageID # 405).

- A follow-up record from Dr. Mahajan dated August 14, 2020, indicating that Boone uses a cane, and that "Dr. Decaro is taking care of her anxiety and depression." (ECF Doc. No. 5, Exhibit 9F, PageID # 627).

(ECF Doc. No. 9, PageID # 723-24).

Boone then cites her own testimony from the hearing before the ALJ wherein she testified, in part, that she cannot work full-time because her MS has worsened, she is experiencing problems with her cervical spine, she is having frequent falls, memory issues, and vertigo, she has weakness in her lower extremities, she does not feel safe driving, she has daily nerve pain, she has to use a cane when she leaves the house, her husband helps her dress, she gets confused easily, and she can only walk twenty feet and can stand for about fifteen minutes. (*Id.* at PageID # 724-25). Boone argues that the ALJ failed to address her symptoms related to the intermittent nature of her MS, including dizziness and fatigue, and her use of a cane, requiring a remand of this matter. (*Id.* at PageID # 725).

Boone then argues that, even if the ALJ was accurate in finding that she could perform some daily activities, there was insufficient evidence to prove that she could engage in substantial gainful activity on a sustained basis. (*Id.* at PageID # 725). Boone asserts that the ALJ acknowledged her pain and fatigue, but failed to properly consider whether her pain is a disabling impairment. (*Id.* at PageID # 727). Boone points to her testimony wherein she testified that she has daily nerve pain, and argues that her disabling pain "would likely result in her inability to sustain attention and concentration and would result in her inability to sustain work activity on a full-time basis." (*Id.* at PageID # 728). Boone also asserts that the ALJ "clearly did not consider the effect of the combination of [her] impairments and whether they supported the ALJ's decision finding that she was capable of performing work on a sustained and full-time basis[,]" and that the ALJ's failure "to complete a thorough analysis of the interaction of all of [her] impairments was in error and should result in a remand of this matter." (*Id.* at PageID # 729). Boone asserts that the ALJ's RFC assessment does not comport with SSR 96-8p, and that the ALJ "erroneously did not build an accurate and logical bridge between the evidence documenting [her] disabling problems and the ALJ's decision to deny benefits." (*Id.* at PageID # 729-30).

*vi.*        *Analysis*

Boone has not established that the ALJ erred by finding that Boone's MS did not meet the severity requirements of Listing 11.09. More specifically, Boone has not pointed to specific evidence that demonstrates she reasonably could meet or equal every requirement of Listing 11.09. *Smith-Johnson*, 579 F. App. at 432. Instead, the evidence Boone cites supports her diagnosis of MS, mild weakness in the right lower extremity, mild difficulty in maintaining a Romberg's position, her use a cane (singular), decreased sensation in the right lower extremity, nerve pain, foot drop, recent falls, and occasional forgetfulness. This evidence does not demonstrate that Boone has "disorganization of motor function in two extremities" resulting in an "extreme limitation" for purposes of Listing 11.09(A), nor does is establish that Boone has a marked limitation in any of the Listing 11.09(B) criteria. Most notably, while the evidence indicates that Boone uses a cane, there is no evidence indicating that she uses two canes as required to meet the definition of an "extreme limitation[.]" 20 C.F.R. § 404, Subpart P, Appendix 1, § 11.00D2. Moreover, the evidence indicates that Boone experiences pain with her condition, but Boone has not pointed to any evidence demonstrating that her pain is a disabling condition. *See Fergus v. Comm'r of Soc. Sec.*, No. 5:20-CV-02612-CEH, 2022 WL 743487, at *4 (N.D. Ohio Mar. 11, 2022) (citing 20 C.F.R. § 404.1512(a)) ("The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits.").

Regarding Boone's argument that the ALJ did not consider the combined effects of her impairments, the record indicates otherwise.  Here, the ALJ expressly noted in his summary of the applicable law that an ALJ "must determine whether the claimant has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe'" at Step Two. (ECF Doc. No. 5, PageID # 36). Prior to setting forth his findings of fact and conclusions of law, the ALJ indicated that he considered the "entire record[.]" (*Id.* at PageID # 37). Then, at Step Two,

29

the ALJ determined that Boone "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" (*Id.* at PageID # 40). In his RFC assessment, the ALJ again referred to Boone's "impairments" in discussing Boone's ability to perform her past work and, at Step Two, the ALJ discussed Boone's impairments individually. (*Id.* at PageID # 41-44 (referring to Boone's "impairments"); *id.* at PageID # 38-40 (discussing Boone's non-severe impairments)). Despite Boone's argument to the contrary, this is sufficient to show that the ALJ properly considered the combined effects of Boone's impairments. *See Wilson*, No. 5:20-CV-02414, 2022 WL 4616979, at *5-6.

 Lastly, to the extent Boone argues that the ALJ's analysis is insufficient and perfunctory, the ALJ's decision, when viewed as a whole, supports the ALJ's Step Three conclusions. *See Anderson*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) (It's well-established that a reviewing court conducts a holistic review of the ALJ's decision and may look to findings elsewhere in the opinion to support Step Three conclusions."). While the ALJ's Step Three analysis is one paragraph long, the ALJ specifically indicated that his decision in this regard would be discussed "in more detail below[.]" (ECF Doc. No. 5, PageID # 40). Then, in his RFC assessment, the ALJ provided a detailed analysis of the medical records pertaining to Boone's MS and her related symptoms. (*Id.* at PageID # 52). Having conducted a holistic review of the ALJ's decision, I conclude that the ALJ's Step Three conclusion is supported by substantial evidence.

### 4.  *Boone's Fourth Assignment of Error*

Next, Boone argues that the ALJ violated SSR 16-3P when evaluating her symptoms. (*Id.* at PageID # 730). For the following reasons, I conclude that Boone's argument lacks merit.

### i.       *Evaluation of a Claimant's Symptoms*

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed. Appx. 540,

542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).[2]

In evaluating a claimant's symptoms at the second step of the analysis, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, there are seven factors that the ALJ should consider. These factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7.

The ALJ is not required to discuss each of these factors or even all the evidence in the record but need only acknowledge the factors and discuss the evidence that supports her decision.

---

[2] The Social Security Administration ("SSA") previously characterized the evaluation of a claimant's subjective symptom complaints as a "credibility" determination. *See* SSR 96-7p, 1996 SSR LEXIS 4 (July 2, 1996). In March 2016, however, the SSA issued SSR 16-3p. Therein, the SSA explained that this characterization did not accurately reflect the language in the regulations and eliminated the term "credibility" from its sub-regulatory policy. *See* SSR 16-3p, 2016 WL 1119029 (Oct. 25, 2017). The SSA explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the subjective complaints' consistency with other evidence in the record. SSR 16-3p, 2016 WL 1119029. Despite these changes in terminology, courts have concluded that SSR 16-3p did not substantially change existing law on this issue. *See Banks v. Comm'r of Soc. Sec.*, 2018 WL 6060449 at *5 (S.D. Ohio Nov. 20, 2018) (quoting language in SSR 16-3p that states intention to "clarify" and not to substantially "change" existing SSR 96-7p), adopted at 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

*See Bryson v. Comm'r of Soc. Sec.*, 2021 WL 2735993 at * 14 (N.D. Ohio June 10, 2021), adopted by, 2021 WL 2720071 (N.D. Ohio July 1, 2021). However, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL 1119029 at * 9. Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id. See also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

An ALJ is not required to accept the claimant's complaints at face value but may discount them based on his consideration of the above factors. *See Dooley v. Comm'r of Soc. Sec.*, 656 Fed. Appx. 113, 119 (6th Cir. 2016); *Bryson*, 2021 WL 2735993 at * 15. In light of the ALJ's opportunity to observe the claimant's demeanor, the ALJ's evaluation of a claimant's subjective symptoms is entitled to considerable deference and should not be discarded lightly. *See Dooley*, 656 Fed. Appx. at 119 ("[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'") (quoting *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)). *See also Walters v. Comm'r. of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Jidas v. Comm'r of Soc. Sec.*, 2019 WL 2252289 at * 8-9 (E.D. Mich. Feb. 26, 2019), adopted by, 2019 WL 1306172 (E.D. Mich. March 22, 2019). Indeed, a reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). *See also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017) (noting that "while an ALJ's credibility determinations must be supported by substantial evidence, we accord them

special deference"); *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. Appx 468, 476 (6th Cir. 2016)

(noting that, "in practice ALJ credibility findings have become essentially 'unchallengeable.'");

*Riebe v. Comm'r of Soc. Sec.*, 2019 WL 4600628 at * 7-8 (N.D. Ohio Sept. 23, 2019) (same).

### ii.      *The ALJ's Analysis*

As noted, the ALJ determined that Boone "has the [RFC] to perform sedentary work as

defined in 20 CFR 404.1567(a) and 416.967(a)" except that Boone:

- cannot use left lower extremity foot controls;
- requires a cane for community distances;
- can occasionally climb ramps and stairs;
- can never climb ladders, ropes, or scaffolds;
- can occasionally balance, stoop, kneel, crouch or crawl;
- must avoid concentrated exposure to extreme heat, extreme cold, or humidity;
- must avoid even moderate exposure to hazards including unprotected heights or dangerous moving equipment; and
- requires a cane for standing, walking, or balancing.

(ECF Doc. No. 5, PageID #41). The ALJ explained that:

> [i]n making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c.

(*Id.*). The ALJ explained the two-step process for evaluating a claimant's symptoms, and

concluded that Boone's "medically determinable impairments could reasonably be expected to

cause the alleged symptoms; however, the [Boone's] statements concerning the intensity,

persistence and limiting effects of these symptoms are not entirely consistent with the medical

evidence and other evidence in the record for the reasons explained in this decision." (*Id.*). In

support of his decision, the ALJ explained:

> The claimant alleged that she was unable to perform work due to the limiting signs and symptoms associated with her impairments. She explained that she need to use a cane, and indicated that she was having a lot of vertigo at that time. She testified that she had numbness in her extremities, and noted the cane helped with episodes of foot drop and dizziness. She indicated that she could walk approximately 20 feet

without needing to stop, stand no more than 15 minutes, lift no more than five pounds, and was unable to sit for long periods. She explained that she required assistance with dressing and occasionally needed help with washing her hair. The claimant reported that she experienced a "fog" due to her multiple sclerosis, during which times she experienced confusion and difficulty concentrating.
. . .

The claimant experienced signs and symptoms associated with her severe impairment. Treatment notes from August 9, 2019 indicate that she had a history of multiple sclerosis (MS) and neuropathy (3F/40-43). During a September 3, 2019 evaluation with Garren Decaro, MD, she reported that she was diagnosed with relapsing-remitting multiple sclerosis in June 2009, but noted that she was not treating with medication or a neurologist at that time. No specific abnormalities were noted upon examination, but gabapentin was prescribed and a neurology referral was provided (3F/36-39). The claimant presented for a neurology evaluation with Darshan Mahajan, MD on October 18, 2019. She explained that her last flare of MS was in 2015 during which time she treated with methylpred. She described fatigue, right-sided weakness, two recent falls, and widespread electrical shocks and burning sensations. She reported little relief with use of gabapentin. Upon examination, she exhibited mild weakness in the right lower extremity. However, she was awake, alert, and pleasant. Her speech comprehension and expression were intact, her muscle tone and muscle mass were normal, and she had no fasciculations or involuntary movements. Her deep tendon reflexes were intact and symmetric. She walked with a cane, but was able to maintain a Romberg's position with mild difficulty. Further, while she had decreased sensation in the right lower extremity, but the rest of the sensory examination was unremarkable to pinprick and temperature (4F/4-8, 12F/2-6).

The claimant sought treatment for her impairments. A brain MRI from November 8, 2019 showed a focal area of abnormal FLAIR and T2 FLAIR hyperintense signal left frontal lobes white matter likely reflective of a focal area of MS/white matter demyelinating disease. It showed two small foci of T2 shine through in the right and left cerebellum consistent with small bilateral remote cerebellar lacunar infarctions. However, there was no enhancement or restricted diffusion to suggest active demyelization (1F/2-3, 2F/2-3, 3F/62-64). During her January 8, 2020 follow up with Dr. Mahajan, it was noted that she had started treating with Mayzent, noting that she had been doing well with medication side effects. She described having fallen due to left foot drop, but noted that her last fall was in November 2019. She was awake, alert, and well oriented upon examination. Her speech was clear, her speech comprehension and expression were intact, and her vision was clear with no diplopia. She walked with a cane, but had no facial weakness, her swallowing was normal, and her strength was better in the foot extensors (4F/9- 12, 12F/7-10). Clinical findings from February 6, 2020 included normal musculoskeletal range of motion, normal coordination, and no abnormal muscle tone (5F/11-14). During her August 14, 2020 evaluation with Dr. Mahajan, she reported she continued to treat with Mayzent and indicated that her most recent fall was in June. Upon examination, she was awake, alert, and well oriented. Her speech comprehension and expression were intact, and her vision was clear with no diplopia. She had no facial weakness

and her swallowing was normal. While she ambulated with a cane, her strength was well maintained. No changes were made to her treatment regimen (9F/2-4).

Therefore, the evidence supports that the claimant experienced limiting signs and symptoms associated with her severe impairment. She has a history of a diagnosis with MS, with brain imaging that showed a focal area of abnormal FLAIR and T2 FLAIR hyperintense signal left frontal lobes white matter likely reflective of a focal area of MS/white matter demyelinating disease, as well as two small foci of T2 shine through in the right and left cerebellum consistent with small bilateral remote cerebellar lacunar infarctions (1F/2-3, 2F/2-3, 3F/62-64). She reported symptoms that included fatigue, right-sided weakness, falls, widespread electrical shocks and burning sensations (4F/4-8, 12F/2-6). Associated clinical findings included ambulating with a cane, mild weakness of the right lower extremity, decreased sensation in the right lower extremity, mild difficulty with a Romberg's position, and foot drop (4F/4-8, 4F/9-12, 9F/2-4, 12F/2-6, 12F/7-10).

(*Id.* at PageID # 41-43). The ALJ then determined that, while the evidence supported that Boone experienced the limiting signs of symptoms associated with her MS, Boone's "statements about the intensity, persistence, and limiting effects of her symptoms are inconsistent because the level of limitation alleged is not altogether consistent with the objective finding." (*Id.* at PageID # 43.).

The ALJ explained:

[Boone's] brain imaging showed no enhancement or restricted diffusion to suggest active demyelization (1F/2-3, 2F/2-3, 3F/62-64). She exhibited intact speech comprehension and expression, normal muscle tone, and no fasciculations or involuntary movements (4F/4-8, 4F/9-12, 9F/2-4, 12F/2-6, 12F/7-10). Further, the evidence reflects findings of normal sensation in all areas other than her right lower extremity, intact and symmetric deep tendon reflexes, clear vision with no diplopia, normal swallowing, no facial weakness, well-maintained strength, and normal coordination (4F/4-8, 4F/9-12, 5F/11-14, 9F/2-4, 12F/2-6, 12F/7-10).

(*Id.*). The ALJ then set forth Boone's functional limitations. (*Id.*). In doing so, the ALJ cited Boone's reported fatigue, the evidence of Boone's loss of lower extremity strength, her left foot drop, her use of a cane, and her reported pain, vertigo, and dizziness, as well as her "potential gait instability/falls[.]" (*Id.*). The ALJ then addressed the opinions of the state agency medical consultants. (*Id.* at PageID # 43-44). The ALJ explained:

The State agency medical consultants, Mehr Siddiqui, MD and Gail Mutchler, MD, assessed that the claimant retained the ability to lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk no more than four hours in an eight hour

workday, sit no more than six hours in an eight-hour workday; never push/pull with the left lower extremity; only frequently climb ramps and stairs, never climb ladders, ropes, or scaffolds; avoid concentrated exposure to extreme cold, extreme heat, and humidity; and avoid all exposure to unprotected heights or heavy machinery (4A, 7A). At the reconsideration level, Dr. Mutchler also added the limitation for the need for an ambulatory aide for community distances (7A). The undersigned finds these assessments to be persuasive in that the limitations for climbing, her left lower extremity, temperature extremes, humidity, and hazards are consistent with the need to avoid environments that may exacerbate her symptoms along with the claimant's reported issues with vertigo/dizziness, left foot drop, and the potential for instability/falls (4F/4-8, 12F/2-6). However, to account for her reported pain along with findings of loss of strength and sensation, additional postural limitations, as described in the residual functional capacity above, are supported (4F/4-8, 4F/9-12, 9F/2-4, 12F/2-6, 12F/7-10). Additionally, Dr. Mutchler's assessment that the claimant required an ambulatory device for community distances is persuasive as it is consistent with findings of use of a cane to walk and mild difficulty with a Romberg's position (4F/4-8, 4F/9-12, 9F/2-4, 12F/2- 6, 12F/7-10). However, to account for her reported fatigue, vertigo/dizziness, and falls, limiting the claimant to no greater than the sedentary exertional level with the use of a cane for standing, walking, or balancing is supported. Nonetheless, greater limitations, as alleged are not consistent with objective findings of no enhancement or restricted diffusion to suggest active demyelization (1F/2-3, 2F/2- 3, 3F/62-64). Further, they are not consistent with evidence that includes normal swallowing, no facial weakness, intact and symmetric deep tendon reflexes, clear vision with no diplopia, well-maintained strength, normal coordination, intact speech comprehension and expression, normal muscle tone, and no fasciculations or involuntary movements (4F/4-8, 4F/9- 12, 5F/11-14, 9F/2-4, 12F/2-6, 12F/7-10).

(*Id.*). The ALJ concluded that "these findings are supported by the objective record and reports of [Boone's] daily activities. Therefore, when considering these findings in combination with the signs and symptoms caused by her severe impairments previously discussed, the undersigned finds that [Boone] retained the ability to perform work with the limitations described in the [RFC.]" (*Id.* at PageID # 44).

### iii.        *Boone's Arguments*

Boone argues that the ALJ violated SSR 16-3p when evaluating her symptoms. (ECF Doc. No. 9, PageID # 730). More specifically, Boone argues that "the ALJ did not properly evaluate the medical evidence and make a defensible determination as to whether [her] testimony was credible." (*Id.*). Boone asserts that "the ALJ failed to articulate any rationale beyond the boilerplate

paragraph finding that [her] statements were inconsistent with the medical evidence[,]" which constitutes harmful error and requires a remand. (*Id.* at PageID # 731-32).

In support of her argument, Boone points to her testimony wherein she testified, in part, that: she cannot work full-time because her MS has worsened; she is experiencing problems with her cervical spine; at the time she stopped working, she was having frequent falls and memory issues; she experiences vertigo; she has a lot of weakness in her lower extremities with foot drop on her left; when she was working, she missed a lot of work due to MS flareups and relapses; her MS is stage three; she experiences daily nerve pain; she uses a cane when she leaves the house; she can only walk twenty feet and can sit for fifteen minutes; she can lift a maximum of ten pounds; she has difficulty moving her head; her husband helps her dress and sometimes washes her hair; she needs help with daily chores; and she forgets things and gets confused easily. (*Id.* at PageID # 730-31).

### iv.        *Analysis*

Boone's argument lacks merit. Boone's primary argument in support of her position is that the ALJ provided an insufficient and perfunctory analysis, requiring remand. (ECF Doc. No. 9, PageID # 731-32). Initially, I note that Boone misquotes the record. Boone asserts that the ALJ erred by rejecting her statements and testimony with a "blanket boilerplate conclusion" that runs afoul of SSR 16-3p. (*Id.* at PageID # 731). In this regard, she quotes the ALJ's decision as follow: "statements concerning the intensity, persistence and limiting effect of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[,]" yet Boone omits the last part of that sentence: "***for the reasons explained in this decision***." (*Id.*; ECF Doc. No. 5, PageID # 41) (emphasis added). The ALJ then addressed Boone's MS, including Boone's complaints of fatigue, nerve pain, right-sided weakness, recent falls, vertigo/dizziness, and widespread electrical shocks and burning sensations. (ECF Doc. No. 5, PageID # 42-43). The ALJ

cited the portions of the record upon which he relied, and concluded that Boone experienced limiting signs and symptoms associated with her MS. (*Id.* at PageID # 42). The ALJ then determined, however, that Boone's "statements about the intensity, persistence, and limiting effects of her symptoms are inconsistent because the level of limitation alleged is not altogether consistent with the objective finding." (*Id.* at PageID # 43). As noted, the ALJ explained:

> Her brain imaging showed no enhancement or restricted diffusion to suggest active demyelization (1F/2-3, 2F/2-3, 3F/62-64). She exhibited intact speech comprehension and expression, normal muscle tone, and no fasciculations or involuntary movements (4F/4-8, 4F/9-12, 9F/2-4, 12F/2-6, 12F/7-10). Further, the evidence reflects findings of normal sensation in all areas other than her right lower extremity, intact and symmetric deep tendon reflexes, clear vision with no diplopia, normal swallowing, no facial weakness, well-maintained strength, and normal coordination (4F/4-8, 4F/9-12, 5F/11-14, 9F/2-4, 12F/2-6, 12F/7-10).

(*Id.*). The ALJ then determined that functional limitations were warranted, and set forth the limitations described above. (*Id.*). In doing so, the ALJ relied upon and cited the opinions of the state agency medical consultants. (*Id.* at PageID # 43-44).

While the ALJ did not explain his rationale in a single succinct paragraph, the ALJ explained his decision in a manner that aided the Court in understanding the reasons the ALJ did not accept the entirety of Boone's subjective complaints, which is sufficient. *Walker v. Comm'r of Soc. Sec.*, No. 1:21-CV-01474-JG, 2022 WL 2612244, at *13 (N.D. Ohio May 17, 2022), *report and recommendation adopted*, No. 1:21-CV-01474, 2022 WL 4479922 (N.D. Ohio Sept. 27, 2022). Accordingly, Boone's fourth assignment of error lacks merit.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the ALJ's decision.

Dated: __January 13, 2023_____

*s/ Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018)

(quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).